UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARKEE COOPER, SR., ZION COOPER AND, MARKEE COOPER, JR., by and through their Parents and guardians MARKEE COOPER, SR. And SHENITA COOPER<br>    Plaintiffs,<br>    -vs-<br><br>Chicago Police Officers S. DAILEY, No. 10890, M. BONNSTETTER, No. 15963, F. MACK, No. 198404, J. FRANO, No. 11772, R. PUCILLO, No. 16850, W. JOHNSON, No. 17442, A. MONACO, No. 19253, S. LAURETTO, No. 5882, V. FICO, No. 6284, L. WILLEMS, No. 7394, M. NAPOLI, No. 9560, S. REINA, No. 2622, D. ROSS, No. 177, G. DE SALVO, No. 218, and The CITY OF CHICAGO,<br>    Defendants. | No. 07 CV 02144<br><br>Judge Dow<br><br>Magistrate Nolan |

**FIRST AMENDED COMPLAINT**

**NOW COMES** the plaintiffs, MARKEE COOPER, SR., ZION AND MARKEE COOPER, JR., by and through their parents and guardians, MARKEE COOPER, SR., AND SHENITA COOPER, by and through his attorneys, ERICKSON & OPPENHEIMER, and BRENDAN SHILLER. complaining of the Defendants, Chicago Police Officers S. DALEY, No. 10890, M. BONSTETTER, No. 15963, F. MACK, No. 198404, J. FRANO, No. 11772, R. PUCILLO, No. 16850, W. JOHNSON, No. 17442, A. MONACO, No. 19253, S. LAURETTO, No. 5882, V. FICO, No. 6284, L. WILLEMS, No. 7394, M. NAPOLI, No. 9560, S. REINA, No. 2622,  D. ROSS, No. 177, G. DE SALVO, No. 218, and The CITY OF CHICAGO, and states as follows:

## INTRODUCTION

1. This is a civil action seeking damages against defendants for committing acts under color of law, and depriving plaintiffs of rights secured by the Constitution and laws of the United States. In sum, Plaintiff, along with his children and other relatives were terrorized at gun-point, assaulted, battered and unlawfully seized.

## JURISDICTION

2. The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C., § 1983, the Judicial Code, 28 U.S.C. § 1331 and 1343 (a); the Constitution of the United States; and pendent jurisdiction as provided under U.S.C., § 1367(a).

## PARTIES

3. Plaintiff, Markee Cooper, Sr. is 32-year-old decorated Chicago Police Officer who is a member of the tactical unit and currently resides at 1015 N. Laramie, in Chicago, Illinois.

4. Markee Cooper, Jr. is the 14-year-old son of Markee Cooper, Sr. and Shenita Cooper. Cooper, Jr., who was 12 at the time of the incident complained of, resides with his mother and father at 1015 N. Laramie, in Chicago, Illinois.

5. Zion Cooper is the 13-year-old son of Markee Cooper, Sr. and Shenita Cooper. Cooper resides with his mother and father at 1015 N. Laramie, in Chicago, Illinois.

6. Defendants Daley, Bonstetter, Frano, Mack, Pucillo, Johnson, Monaco, Reina, Lauretto, Willems, Ross, Napoli, De Salvo, and Fico were, at the time of this occurrence, employees of the Chicago Police Department and acted under their authority as a duly appointed police officers in the Chicago Police Department at all relevant times.

7. Defendant City of Chicago is a municipal corporation organized under the laws of the State of Illinois. It is responsible for the policies, procedures, and practices implemented

through its various agencies, agents, departments, and employees, and for injury occasioned thereby. It was and is the public employer of the John Doe Defendants.

## BACKGROUND FACTS

8. On or about February 16, 2007, Defendant Daley swore out two false complaints for a search warrant. In the first false complaint, Daley stated that:

On 16 FEB 07, I had a conversation with a confidential informant I will refer to as C/I I have known this C/I for the past two years during which time the C/I has provided and been a reliable source of information concerning narcotic activity. On three separate occasions, I have acted upon the information provided by this C/I and on all three occasions I have recovered illegal narcotics. Out of the three occasions, I have made three arrests. The recovered illegal narcotics have been submitted to the Illinois State Police Crime lab for testing and analysis. On all three instances, the crime lab found the presence of a controlled substance in each of the items submitted. Of the three arrests, all three arrests have resulted in criminal charges in Circuit Court of Cook County still pending before the Circuit Court of Cook County.
On 16 FEB 07, the C/I related to P.O. Daley # 10890 that on 16 FEB 07, the C/I had been inside the 2nd Floor Apartment of 1015 N. Laramie, Chicago, Cook County, IL. The C/I stated that the C/I has gone to this residence on several occasions in the past three months, each time to purchase a quantity of "Rocks," the street term for "crack" cocaine. **The C/I stated that each time the C/I goes to this residence to purchase "rocks," the C/I is always greeted and allowed into the residence by a subject known as "GUY."** The C/I stated that each time the C/I is in this residence, "GUY" sells the C/I a quantity of "rocks." **On 16 FEB 07, the C/I stated that the C/I purchased six "rocks" from "GUY,"** for U.S.C.. The C/I stated that while inside the residence of 1015 N. Laramie, Chicago, Cook County, IL, the C/I tendered "GUY" U.S.C.. In return, "GUY" brought the C/I into a bedroom, the C/I stated that "GUY" then walked out of the bedroom, and returned shortly after holding a Vaseline canister which contained numerous smaller, clear, plastic bags, each of which contained a white, rock-like substance which the C/I believed to be "crack" cocaine. The C/I stated that "GUY" reached into the Vaseline canister and retrieved six of the "rocks." The C/I stated that the C/I observed a large amount of small, clear, plastic baggies containing suspect "crack" cocaine remaining in the Vaseline canister that "GUY" retrieved the "rocks" from. "GUY" then handed the "rocks" to the C/I. The C/I then exited the residence **a short time later, the C/I smoked the "rocks" the C/I had just purchased from "GUY" and began to feel the same euphoric high the C/J (sic) has felt from smoking "crack" cocaine in the past.**
R/O drove the C/I past the address of 1015 N Laramie, Chicago, Cook County, IL, at which time the C/I positively identified the red, brick 2-flat building with the address of 1015 N. Laramie, and the 2nd Floor apartment, as the same residence where "GUY" resides and is the same residence where the C/I purchases "crack" cocaine from "GUY."

[Emphasis added]

9. In the second complaint for search warrant, filled out by Daley on the same day,

    Defendant Daley swore that:

    On 16 FEB 07, I had a conversation with a confidential informant I will refer to as C/I I have known this C/I for the past two years during which time the C/I has provided and been a reliable source of information concerning narcotic activity. On three separate occasions, I have acted upon the information provided by this C/I and on all three occasions I have recovered illegal narcotics. Out of the three occasions, I have made three arrests. The recovered illegal narcotics have been submitted to the Illinois State Police Crime lab for testing and analysis. On all three instances, the crime lab found the presence of a controlled substance in each of the items submitted. Of the three arrests, all three arrests have resulted in criminal charges in Circuit Court of Cook County still pending before the Circuit Court of Cook County.
    On 16 FEB 07, the C/I related to P.O. Daley # 10890 that on 16 FEB 07, the C/I had been inside the Basement Apartment of 1015 N. Laramie, Chicago, Cook County, IL. **The C/I stated that the C/I has gone to this residence on several occasions in the past three months, each time to purchase a quantity of "Rocks," the street term for "crack" cocaine. The C/I stated that each time the C/I goes to this residence to purchase "rocks," the C/I is always greeted and allowed into the residence by a subject known as "LAWRENCE TOLLIVER."** The C/I stated that each time the C/I is in this residence, "LAWRENCE TOLLIVER" sells the C/I a quantity of "rocks." On 16 FEB 07, the C/I stated that the C/I purchased four "rocks" from LAWRENCE TOLLIVER, for U.S.C.. The C/I stated that while inside the residence of 1015 N. Laramie, Chicago, Cook County, IL, the C/I tendered LAWRENCE TOLLIVER U.S.C.. In return, LAWRENCE TOLLIVER told the C/I to wait in the living room. The C/I stated that LAWRENCE TOLLIVER then walked out of the living room, and returned shortly after holding a large, clear, plastic bag which contained numerous smaller, clear, plastic bags, each of which contained a white, rock-like substance which the C/I believed to be "crack" cocaine. **The C/I stated that LAWRENCE TOLLIVER then handed the "rocks" to C/I**. The C/I then exited the residence and a short time later, the C/I smoked the "rocks" the C/I had just purchased from LAWRENCE TOLLIVER and began to feel the same euphoric high the C/I has felt from smoking "crack" cocaine in the past. **The C/I stated that the C/I has been smoking "crack" cocaine for the past three years and each time the C/I purchases "crack" cocaine from LAWRENCE TOLLIVER at the Basement Apartment of 1015 N. Laramie**, Chicago, Cook County, IL. The C/I stated that every time the C/I purchases cocaine from LAWRENCE TOLLIVER inside the residence of 1015 N. Laramie, Chicago, Cook County, IL, LAWRENCE TOLIVER (sic) always has an abundance of "crack" cocaine in his possession and the C/I never has any problems purchasing "crack" cocaine from LAWRENCE TOLLIVER.
    [Emphasis added]

10. Armed with these two false, and wildly inconsistent sworn complaints, Officers Daley and Bonstetter went before Cook County Judge Nick Ford, on February 17, 2007 and obtained two separate search warrants for 1015 N. Laramie.

11. Armed with the wrongfully obtained search warrants, all Defendants went to 1015 N. Laramie, and waited outside the home. They waited until Markee Cooper, Sr. arrived home. Shortly after Markee Cooper, Sr. arrived at around 7 p.m., all named Defendant Officers forcibly entered into Plaintiff's home at 1015 N. Laramie.

12. Present in the home were Markee, Sr., Markee, Jr, Zion, Shenita, and Markee Sr.'s mother Marge Thomas.

13. Plaintiff Markee, Sr. assumed that he was being burglarized, and drew his gun. All Defendants then drew their guns. Plaintiff immediately identified himself as an officer and presented his badge. Defendants then presented the unlawfully obtained warrants.

14. Plaintiff presented Defendants with a deed to the building, showing that he was the lawful owner. Plaintiff also explained that the basement to this two-unit building was an unfinished basement used for storage and that no one lived in the basement.

15. Almost immediately, both the affiant for the warrants (Defendant Dailey) and his partner (Defendant Bonstetter) realized that they had made a mistake. Defendant Dailey realized that none of the conditions in the house matched the information that he claimed to have received from the purported informant. Dailey realized that no one lived in the basement. Dailey realized that there were children present. Dailey realized that no one was present selling drugs. Dailey realized that no one matching the description of Tolliver or "guy" were present.

16. The deed presented by Plaintiff showed that they had purchased the home four years prior.

17. Despite the presentation of Cooper's badge, the deed to the home, and the fact that the basement was unfinished and not lived in, the lack of anyone matching the description of either "Guy" or "Tolliver", and the clear lack of any indicia of drugs or drug dealing, Defendants Reina and Ross insisted that the entire home must be searched and that all present must remain while the search continued.

18. For the next 75 minutes, Plaintiffs were forced to remain in the home while Defendants thoroughly searched the home, including the use of two dogs.

19. The large, unmuzzled German Shephards created fear and anxiety amongst plaintiffs, particularly Markee, Jr. and Zion.

20. Eventually, after finding no signs of drugs, drug paraphernalia, of a person named "guy" or a person named "Tolliver" or even of any existence of anyone living in the basement, the officers left.

21. When the officers went back to the station they wrote false reports, including the contention that the Coopers stated made statements that implied that Tolliver had previously lived at 1015 North Laramie.

22. Since the incident both Markee, Jr. and Zion have experienced nightmares, anxiety attacks, fear and nervousness around dogs and police officers, and other mental and emotional damages.

23. Since the incident, Markee Sr., has had his name and reputation smeared in both his local community as well as at his work. Markee Sr. was a 8-year member of the military where he was a military police prior to his four-years of stellar service for the Chicago

Police Department. In March, 2007, Markee was honored with the award of top Chicago police officer by the department. Despite his unblemished record of success, Markee, Sr. has been the source of various rumors and scurrilous whispering campaigns directly resulting from the above incident. In addition, Markee, Sr. has become a pariah within his own police department. The fact that he has less trust amongst his co-workers in itself has placed Markee at a greater danger of being injured on the job.

24. Further, Markee has seen continued harassment since this incident. On several occasions, off-duty officers have been observed waiting out in front and in back of the Cooper residence on Laramie, apparently simply there for the purpose of intimidation.

MONELL BACKGROUND

25. There is a written Chicago Police Department Policy on the obtaining and executing search warrants. Department Special Order 01-07. This written policy exists ostensibly to ensure that statutory and constitutional protections are adhered to. In reality, this written policy is not the policy and procedure followed by the Chicago Police Department, and is instead simply an institutional canard designed to hide the actual policy, procedure and routines of the Chicago Police Department that regularly result in warrants being obtained in direct violation of the United State's Constitutional probable cause requirement.

26. According to the DSO 01-07, either the unit commanding officer or the watch commander is supposed to review all complaints for search warrant to ensure the existence of probable cause. In fact, this review is perfunctory and never actually occurs. This routine and de facto policy signals to Chicago Police Officers that they have leeway in "stretching" the existence of probable cause.

27. Also according to DSO 01-07, if a complaint for warrant is based on a confidential informant, then the unit commanding officer or watch commander is supposed to review documented evidence of past cases involving the informant, or ensure that a corroborative investigation occurred. In fact, it is the routine and unwritten policy of the Chicago Police Department to not undertake either the document review or ensure that a corroborative investigation occurred. This routine and de facto policy gives Chicago Police Officers confidence that they can exaggerate or even fabricate the reliability of confidential informants.

28. There is an unwritten quota policy for law enforcement officers on certain units, such as tactical units, to obtain a certain number of search warrants for drugs and guns.

29. According to DSO 01-07, once the unit commander and/or watch commander has signed off on the complaint for warrant, the complaint should be presented, in person, to an assistant states attorney at felony review during regular business hours. Part of the reasoning is that the State's Attorney will have the option of interviewing the affiant to determine probable cause. In fact, warrants are rarely, if ever, presented to an assistant state's attorney in person. They are generally faxed. And, Chicago Police Officers, following a de facto policy, often fax the complaint for warrants late at night, implying an emergency, even when they do not intend on serving the warrant until the following day. This de facto policy that allows State's Attorney sign-off on complaints for warrants without a thorough review, by implying to the felony review state's attorney that there is an emergency when there is not.

30. Also according to DSO 01-07, all narcotics related warrant complaints are to be processed by the State's Attorney's Narcotics Prosecution Bureau. It is the unwritten de

facto policy of the Chicago Police to instead fax narcotics related warrant complaints to felony review. The basis for this policy is the understanding that most felony review attorneys are new and young attorneys that will not thoroughly review the complaints for probable cause, unlike the more veteran attorneys at the Narcotics Prosecution Bureau.

31. There is also an unwritten policy that discourages police officers from registering their confidential informants. As a result of this policy, officers are encouraged to create false confidential informants and exaggerate the value and credibility of actual confidential informants.

**COUNT I**

**STATE ASSAULT CLAIM—MARKEE COOPER, Jr.**

32. Plaintiff Markee Cooper, Jr. realleges and reincorporates all previous paragraphs.

33. Acting under color of law, Defendants worked a denial of Plaintiff's rights by assaulting him. Plaintiff believed that he was in danger of being battered by the officers through their instrument, the dogs.

34. Plaintiff is a reasonable person.

35. Any reasonable person would also have become apprehensive in the face of Defendants' threatening conduct.

36. The defendant's conduct that resulted in this assault was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

37. Wherefore, because Defendants created an apprehension of immediate physical harm, Plaintiff requests actual and compensatory damages in an amount deemed at time of trial to be just, fair, and appropriate.

## COUNT II

## STATE ASSAULT CLAIM—ZION COOPER

38. Plaintiff Zion Cooper, realleges and reincorporates all previous paragraphs.

39. Acting under color of law, Defendants worked a denial of Plaintiff's rights by assaulting him. Plaintiff believed that he was in danger of being battered by the officers through their instrument, the dogs.

40. Plaintiff is a reasonable person.

41. Any reasonable person would also have become apprehensive in the face of Defendants' threatening conduct.

42. The defendant's conduct that resulted in this assault was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

43. Wherefore, because Defendants created an apprehension of immediate physical harm, Plaintiff requests actual and compensatory damages in an amount deemed at time of trial to be just, fair, and appropriate.

## COUNT III

## FIRST UNLAWFUL SEIZURE

44. Plaintiffs reallege and reincorporate all previous paragraphs.

45. As described above, Defendant Officers conspired among themselves and falsely arrested and detained Plaintiff without justification and without probable cause thus violating plaintiffs rights under the Fourth Amendment to the United States Constitution, and 42 U.S.C. Section 1983.

46. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

47. On or about February 16, 2007, Defendant Daley swore out two search warrant complaints containing false information. Daley was aware that these complaints were entirely false.

48. These false complaints were the basis for unlawfully breaking into Plaintiff's home, unlawfully searching that home, and unlawfully detaining Plaintiff

49. Defendant knew these complaints to be false.

50. By his conduct, Defendant Daley caused the unlawful entry into Plaintiff's home, and the subsequent unlawful detention of all Plaintiffs.

51. As a direct and proximate result of the wrongful actions of Defendants Plaintiffs suffered mental, emotional and physical damage and traumas, humiliation, loss of liberty, mental distress and anguish.

52. Wherefore because of this conduct and theses injuries, Plaintiffs request compensatory and punitive damages as deemed just by this court, as well as reasonable attorneys fees and costs.

## COUNT IV

## SECOND UNLAWFUL SEIZURE—ALL PLAINTIFFS

53. Plaintiffs reallege and reincorporate all previous paragraphs.

54. As described above, Defendant Officers conspired among themselves and falsely arrested and detained PlaintiffS without justification and without probable cause thus violating plaintiffs rights under the Fourth Amendment to the United States Constitution, and 42 U.S.C. Section 1983.

55. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

56. After the search warrant was served, and after the initial search of the home revealed none of the alleged facts that were present in the initial complaint for a search warrant. Defendants Reina and Ross decided to continue the detention of all Plaintiffs for an additional 75 minutes while they brought dogs in to continue the search.

57. Even if the warrant was not false, and there was probable cause for the initial warrant, this probable cause had completely dissipated at the time that Defendants Reina and Ross decided to continue to detain Plaintiffs for the purpose of more searching.

58. As a direct and proximate result of the wrongful actions of Defendants, Plaintiffs suffered mental, emotional and physical damage and traumas, humiliation, loss of liberty, mental distress and anguish.

59. Wherefore because of this conduct and theses injuries, Plaintiffs request compensatory and punitive damages as deemed just by this court, as well as reasonable attorneys fees and costs.

## COUNT VI

## UNLAWFUL SEARCH—ALL PLAINTIFFS

60. Plaintiffs reallege and reincorporate all previous paragraphs.

61. As described above, Defendant Officers invaded the privacy of all plaintiffs by conducting a thorough search of their home without probable cause, thus violating Plaintiffs' rights under the Fourth Amendment to the United States Constitution, and 42 U.S.C. Section 1983.

62. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

63. After the search warrant was served, and after the initial search of the home revealed none of the alleged facts that were present in the initial complaint for a search warrant. Defendants Reina and Ross decided to continue the detention of all Plaintiffs for an additional 75 minutes while they brought dogs in to continue the search.

64. Even if the warrant was not false, and there was probable cause for the initial warrant, this probable cause had completely dissipated at the time that Defendants Reina and Ross decided to continue to detain Plaintiffs for the purpose of more searching.

65. As a direct and proximate result of the wrongful actions of Defendants, Plaintiffs suffered mental, emotional and physical damage and traumas, humiliation, loss of liberty, mental distress and anguish.

66. Wherefore because of this conduct and theses injuries, Plaintiffs request compensatory and punitive damages as deemed just by this court, as well as reasonable attorneys fees and costs.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

67. All Plaintiffs re-allege and incorporate by reference all of the allegations in the preceding paragraphs.

68. The acts and conduct of Defendant Officers as set forth above were extreme and outrageous. Defendant Officers intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to all Plaintiffs.

69. Said actions and conduct did directly and proximately cause severe emotional distress to Plaintiffs and thereby constituted intentional infliction of emotional distress.

70. Defendant Officer's conduct was undertaken with malice, willfulness, and reckless indifference to the rights of others.

71. As a proximate result of Defendant Officer's wrongful acts, Plaintiffs suffered damages, including severe emotional distress and anguish.

72. Wherefore, Plaintiffs demand judgment against Defendant Officers and for actual and compensatory damages in an amount deemed at time of trial to be just fair, and appropriate.

## COUNT VIII
### 42 U.S.C. § 1983: Conspiracy to Deprive Constitutional Rights

73. Plaintiff realleges and reincorporates all previous paragraphs.

74. The Defendants reached an agreement amongst themselves to concoct probable cause for the search warrants that led to the unlawful search and seizure of Plaintiff, and to thereby deprive Plaintiff of his rights under the Fourth Amendment and 42 U.S.C. § 1983.

75. The Defendant Officers, acting in concert, conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

76. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

77. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

78. Wherefore, Plaintiffs demand judgment against Defendant Officers and for actual and compensatory damages in an amount deemed at time of trial to be just fair, and appropriate.

## COUNT IX
## RESPONDEAT SUPERIOR

79. Plaintiffs reallege and incorporate all of the allegations in the preceding paragraphs.

80. In committing the acts alleged, Defendant Officers were members and agents of the Chicago Police Department, acting at all relevant times within the scope of their employment.

81. Defendant City of Chicago is the employer of the Defendant Officers.

82. In Illinois, public entities are directed to pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities. 735 ILCS 10/9-102.

83. As a proximate cause of Defendant Officer's unlawful acts, which occurred within the scope of their employment activities, Plaintiff suffered physical and emotional injuries.

84. WHEREFORE, Plaintiff demands judgment against Defendants City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT X
## MONELL CLAIM

85. Plaintiffs reallege and incorporate all of the allegations in the preceding paragraphs.

86. The actions of the individual Defendant Officers as alleged above were done pursuant to one or more *de facto* policies, practices and/or customs of the City of Chicago, Chicago Police Department, the CPD's Office of Professional Standards, and the CPD's Internal Affairs Division.

87. Among the de facto policies of the municipality and its agents were:

   a. An unwritten policy of quotas for tactical officers to obtain search warrants

- **b.** A de facto set of policies that encourages the creation of warrant complaints that do not contain probable cause
- **c.** A de facto set of policies that encourages the creation of false informants and encourages the exaggeration of real informants credibility
- **d.** The failure to properly investigation allegations of police misconduct.
- **e.** The failure to have a system which monitors patterns of alleged police misconduct.
- **f.** The failure to properly discipline sustained allegations of police misconduct.
- **g.** The failure to properly maintain records of police misconduct and allegations of police misconduct, including the use of excessive force and false arrest.
- **h.** The failure to properly hire, train, monitor, and/or supervise officers.

88. A *de facto* policy, practice, and custom of the police code of silence results in police officers refusing to report instances of police misconduct of which they are aware, including the use of non-existent informants and lying on warrant complaints. This conduct included police officers who remain silent or give false or misleading information during official investigations in order to protect themselves or fellow officers from internal discipline or retaliation, civil liability, or criminal prosecution.

89. The aforementioned policies, practices, and customs, individually and collectively have been maintained and/or implemented with deliberate indifference by the Defendant City of Chicago, and have encouraged the individual Defendants to commit the aforesaid wrongful acts against plaintiffs, and therefore acted as a direct and proximate cause of the complained of Constitutional and other legal violations, and Plaintiff's injuries.

**90.** WHEREFORE, Plaintiffs request that judgment be entered in favor of Plaintiffs and against Defendant City of Chicago, and that the Plaintiffs be awarded compensatory damages, reasonable attorney's fees, costs, expenses and any other relief that this Honorable Court finds appropriate and just. Plaintiff also seeks injunctive relief in the form of an order to the City of Chicago to implement real policies that:

    a. Force the creation of official confidential files for all confidential informants;

    b. Forces Chicago Police Officers to follow the policies and guidelines outline in DSO 01-07 ; and

    c. Forces the Chicago Police Department to create a database that tracks by police officer all search warrants that do not result in any seizures, and that results in a review of that officer any time more than 2 non-successful warrant executions occur within any year;

PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully Submitted,

/s/ Brendan Shiller /s/                                          /s/ John Erickson /s/

Brendan Shiller                                                     Jon Erickson
4554 North Broadway                              4554 North Broadway
Suite 325                                                          Suite 325
Chicago, IL 60640                                      Chicago, IL 60640
773-907-0940                                                        773-907-0940
ARDC: 6279789                                           ARDC: 6205277